### SCHUH TRADING CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.
#### Nos. 6389–6392.

Circuit Court of Appeals, Seventh Circuit,
March 8, 1938.

406

David S. Lansden, and David V. Lansden, both of Cairo, Ill., for petitioners.

James W. Morris, Asst. Atty. Gen., Sewall Key, and Ellis N. Slack, Special Assts. to Atty. Gen. Helen R. Carloss, of Washington, D. C.; for respondent.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

These causes were consolidated in one appeal, argued as one, and grow out of the same facts. The petitioners seek to reverse decisions of the United States Board of Tax Appeals in which it was determined that there were deficiencies in the federal income tax of each of them for the calendar year 1929.

The Schuh Trading Company was formerly the Schuh Drug Company, under which name it was incorporated in 1893 and conducted its corporate business until the transactions here involved. Upon its organization, the corporation acquired and continued an established business, conducted for more than forty years by individuals, predecessors of petitioners, extending into six different states, and, having at the time of the execution of the contract involved, some 240 retail customers.

On March 9, 1929, the corporation and all its stockholders entered into a contract with McKesson & Robbins, Inc., a Maryland Corporation, entitled "Transfer Agreement Reorganization of the Schuh Drug Company of Cairo, Illinois, with McKesson & Robbins, Inc." This document provided for the transfer of the drug business and property of the Schuh Drug Company to McKesson & Robbins, or its nominee, in exchange for $562.19 in cash, and 3,877 shares of the common stock and 2,131 shares of the preference stock of McKesson & Robbins. The parties agreed that the assets to be transferred, considering certain agreed prices applied to specific items, amounted to $315,745.07, and that the liabilities to be assumed amounted to $49,290.88; the net assets to be transferred over liabilities to be assumed being $266,454.19.

On April 25, 1929, McKesson & Robbins having designated as its nominee its fully-owned subsidiary, Fuller-Morrison Company, the assets were transferred to the latter company, and on April 29, the stockholders of the Schuh Trading Company received from McKesson & Robbins the shares of stock specified in the agreement in proportions identical with the holdings of such stockholders in the transferring corporation. Obviously, the small amount of cash involved was paid to avoid the issuance of fractional shares. The reorganization contract provided that none of the shares of McKesson & Robbins received should be disposed of for six months, after receipt thereof, except with the prior written consent of McKesson & Robbins.

The four principal stockholders of Schuh Drug Company agreed to guarantee the payment of $37,042.32 of notes receivable transferred to McKesson & Robbins, and the board of directors of Schuh adopted a resolution agreeing to save and keep harmless the guaranteeing stockholders from liability upon the guaranty. This action was approved, likewise, by the stockholders. Upon completion of the transfer, the Schuh Drug Company changed its name to Schuh Trading Company, as it was provided in the reorganization agreement that the transferor should cease doing a drug business, and that the right to use its name should pass to the transferee. The stockholders of Schuh Trading Company surrendered 80

per cent. of their stock. This was canceled and the capital stock reduced thereby from $250,000 to $50,000.

The reorganization contract provided, among other things, that the Schuh Company should transfer all of its assets, business, properties, real and personal, tangible and intangible, rights, privileges, interests, licenses, patents, formulæ, tradenames, trade-marks, good will and franchises of all kinds, at the date of closing the contract, excepting only its corporate franchise, certain real estate, securities and investments, notes and accounts receivable due from officers and employees, insurance on the life of Herman Schuh, and certain claims for tax refunds. The parties entered into no agreement concerning the valuation of the intangible property, including good will or trade contracts. In their agreement they valued the preferred stock at $52 per share and the common stock at $40 per share.

Promptly, upon the completion of the transaction, the transferee, through its nominee, went into possession of the wholesale drug business, and has since conducted it; one of the petitioners being retained as manager, and serving also as director of both the transferee and its nominee.

During the year 1929, partly before but largely after these transactions, McKesson & Robbins acquired upon similar plans the assets and property or capital stock of many other corporations engaged in wholesale drug business throughout the United States, so that at the end of the year it had taken over the business and assets of some sixty-six different companies in various parts of the country.

Eventually $16,300, representing stock investments, reserved by the Schuh Company, proved to be wholly worthless; and the transferor was compelled to pay out some $21,000 on its guaranty of notes receivable transferred.

Petitioner Julius Schuh was indebted to a bank in Cairo to the extent of $42,000, for which he pledged McKesson & Robbins Stock as collateral security. During the year he requested McKesson & Robbins to remove the restriction and allow him to sell the stock, but that company refused.

The Schuh Trading Company, in its income tax return for 1929, made no report of the transaction, upon the theory that it amounted to a reorganization and

was, therefore, nontaxable under the acts of Congress. The Commissioner decided that it was not a reorganization, and that a taxable gain resulted. In his calculation he valued the preferred stock received from McKesson & Robbins at $57.50 and the common at $51.50. The Board of Tax Appeals affirmed his action.

It is contended that the Board erred: (1) In finding that there was no reorganization; (2) if there was in fact no reorganization, in finding that the transaction resulted in gain to the petitioners; and (3) in refusing to receive competent and material evidence. The first two raise the issue of whether the ultimate findings of the Board were supported by the evidence or were contrary to all the evidence. This question we must determine, for such ultimate findings are subject to judicial review, and upon such review the court must substitute its judgment for that of the Board. Helvering, Commissioner, v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755. If the evidence before the Board as the trier of the facts ought to be convincing, it may not say that it is not, because it may not arbitrarily discredit the testimony of witnesses so far as they testify to facts; the facts must be fairly and judicially weighed and determination reached thereon. Chicago Ry. Equipment Co. v. Blair, Commissioner, 7 Cir., 20 F.2d 10; Blackmer v. Commissioner, 2 Cir., 70 F.2d 255, 92 A.L.R. 982; Elkins v. Commissioner, 3 Cir., 91 F.2d 534.

Under section 112 (i) of the Revenue Act of 1928, 26 U.S.C.A. § 112(g) note, the term "reorganization" includes the acquisition by one corporation of substantially all the property of another corporation. This definition is not an all-inclusive one, but simply mentions certain cases with respect to which doubt might arise. It enlarges the connotation of the term, "a party to reorganization," to embrace corporations whose relation to the transaction would not in common usage be so denominated or as to whose status doubt might otherwise arise. Groman v. Commissioner, 302 U.S. 82, 58 S.Ct. 108, 82 L.Ed. ——. Consequently, whether a certain transaction is a reorganization within the statute is a question to be determined from the facts peculiar to each case.

In its opinion the Board relied upon three cases: Nelson Co. v. Helvering, 28

B.T.A. 529; Minnesota Tea v. Helvering, Commissioner, 28 B.T.A. 591 and G. & K. Mfg. Co. v. Commissioner, decided by the Board. Each has since been reversed by the Supreme Court of the United States; the first in Nelson Co. v. Helvering, 296 U.S. 374, 56 S.Ct. 273, 80 L.Ed. 281; the second, in Helvering, Commissioner, v. Minnesota Tea, 296 U.S. 378, 56 S.Ct. 269, 80 L.Ed. 284; and the third, in G. & K. Mfg. Co. v. Commissioner, 296 U.S. 389, 56 S.Ct. 276, 80 L.Ed. 291. Consequently, we must approach the issue with the knowledge that the authorities upon which the Board relied have been determined by the Supreme Court to have been erroneous.

The first immediate question is whether the facts support the ultimate finding of no reorganization. It will be observed that the Schuh Company under its contract changed its name, abandoned the name of Schuh Drug Company and all drug business, and agreed to remain out of that business in the state of Illinois for a definite period; that it reduced its capital stock, and delivered to the transferee all elements of the wholesale drug business of whatsoever character conducted by it for a long period of years. It rented to the nominee its real estate, valued by the parties at $27,000, but by the uncontradicted parol evidence submitted to the Board, really worth $25,000. It reserved certain stock investments amounting to $16,300 later found to be utterly worthless. It repaid to McKesson & Robbins some $21,000 on its guaranty of assets transferred.

According to the undisputed evidence the values of specific property transferred were as follows: (1) Cash in bank, notes and accounts receivable, less reserves for doubtful items and discounts, and inventory at cost or market, "whichever is lower," $260,731.02; (2) advances to customers and installment notes receivable, less reserve for doubtful items, $35,542.32; (3) furniture, fixtures and delivery equipment, "as appraised by the American Appraisal Company July 21, 1928, plus subsequent additions at cost," less depreciation, $17,437.46; (4) prepaid insurance, taxes, etc., $2,034.27; (5) miscellaneous items, $628.08; producing a total, never disputed by the Commissioner and accepted by the Board, $315,745.07. We add to that the value of good will, which we shall hereafter discuss, which was wholly excluded by the Board, $50,000, making the grand total value of assets transferred $365,745.07. The property retained by the corporation, at the same agreed valuations, were: Cash surrender of life insurance on one of the petitioners, $6,098.00; accounts due from officers, $14,035.03; stocks held as investments, $16,300; land and buildings, less depreciation, $27,805.90; prepaid taxes, $375.08; or a total of $64,614.01. The gross assets consisted of the total of the assets transferred, $365,745.07, and those retained, $64,614.01, i. e., $430,359.08. In other words, the assets transferred were, on this valuation, about 85 per cent. of the whole and those retained about 15 per cent. of the whole.

But there should be deducted from the value of the retained assets the following items: Investments found to be worthless, $16,300; excessive valuation of real estate, as established by undisputed evidence, $2,805.90; or a total of $19,105.90. When these items are deducted from the value of the assets retained, the balance of $45,508.10 represents the assets retained and is about 10½ per cent. of the gross assets, leaving approximately 89½ per cent. of the assets transferred. However, in addition to this, it is apparent that $21,124.51, which the corporation repaid on the guarantee of accounts receivable, should likewise be deducted from assets retained, for the only fund the corporation had from which to make this restitution was in the reserved assets. In other words, in making good the guarantee, the retained assets were necessarily depleted by the repayment of $21,124.51. Consequently, eventually, as the result of the continuing guarantee, the retained assets dwindled from $45,508.10 to $24,395.59; the latter figure constituting the net value of all the retained assets. This is approximately 6 per cent. of the gross assets. So, in the end, approximately 94 per cent. of the gross assets were transferred. Thus, if we consider the matter on a percentage basis, it would seem perfectly obvious from the undisputed evidence that substantially all the assets were transferred in perfecting the reorganization.

In this connection we should observe that the assumption of debts does not affect the quantity of property conveyed. It only affects the amount received for the transfer. I does not decrease the quantity of assets delivered; it merely lessens the amount paid for them.

Considering the undisputed evidence before the Board, it is apparent that at least 90 per cent. of the assets of the Schuh Drug Company were transferred to the transferee's nominee; that these included all property relating to the wholesale drug business; that the assets retained consisted of real estate leased to the transferee's nominee and used by it in its business. Irrespective of the percentage, the facts that the transferee was interested only in acquiring drug businesses, that in this instance it took over all of the wholesale drug business of this concern, and that the retained assets were of inconsiderable value and in nowise connected with the property contributing to the end of the reorganization, lead inevitably to the conclusion that substantially all of the property within the meaning of the statute was transferred, and that a reorganization occurred.

■ The Board found, however, that it had before it no evidence of value of property transferred. This conclusion is not sustained by the evidence. The Commissioner never raised any question about the value of the assets transferred. Petitioners' Exhibit 1, including Exhibit b–1, admitted in evidence, was a statement made by Price, Waterhouse & Co., accountants, of the assets to be acquired and the liabilities to be assumed by McKesson & Robbins. According to the testimony of the secretary of the company, this report was made from the books of the company and shows the valuations of specific items according to those records. The accountants certified that the statement fully and completely sets forth the assets and liabilities. The books of the corporation were not produced, but the undisputed testimony was that after the transfer occurred all old records were placed in the basement and, in due course of time, destroyed. These statements themselves indicate that the values were the book values, and that the inventories were taken at cost or market value, whichever was the lowest. Furthermore, counsel for the Commissioner, at the hearing before the Board, in questioning the witnesses, said that one item in the computation "was $281,000 and that was treated by the commissioner as the value of the assets transferred to McKesson." This statement of value is in accord with the statement of the parties attached to the contract as well as the Price, Waterhouse & Co. balance sheet, so far

as specific values were agreed upon. The detailed figures showing how the Commissioner arrived at this value of $281,-784.08 were contained in Petitioners' Exhibit 7, offered in evidence, but refused. This was the statement submitted by the Internal Revenue Department to petitioners as a basis for the alleged deficiencies, and should have been admitted. It is perfectly obvious from the reading of the record that the Commissioner accepted these values and based his computation upon the same; that nobody ever questioned their correctness or the assumption of all that stipulated figures referred to by counsel as figures of value represented the actual value of specific assets transferred. The Commissioner had in fact accepted the values of the assets transferred. The Board was not justified in finding that there was no evidence of actual values before it.

■ It is said that in determining the effect of the transfer the Commissioner could not properly consider the undisputed fact that Schuh Company made restitution on the guaranty of accounts receivable transferred to the extent of $21,000, for the reason that such payment was not made until after 1929, but the evidence shows that this continuing guaranty was a part of the original transaction, and that its effect was to postpone the date at which it could be determined actually what was transferred. The liability of the Schuh Trading Company on this guaranty could not be determined in 1929, but was definitely ascertained thereafter. Then, too, either late in the year or subsequent thereto, it became evident that the investments retained by the Schuh Trading Company were worthless. It is not clear that this ascertainment was made in 1929, but it is undisputed that it became obvious within a year or so thereafter. Inasmuch as the guaranty was a continuing one and affected the value of what was transferred, and, therefore, necessarily caused postponement of the time, within which the value of the assets transferred could be actually determined and within that period the investments proved to be worthless, the Board was not justified in refusing to consider the undisputed evidence as to these items. Furthermore, subsequent events are material in testing the propriety of a valuation. Nachod & United States Signal Co., v. Helvering, 6 Cir., 74 F.2d 164; Sinclair Refining Co. v. Jenkins Petrole-

410

um Process Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496.

Again it is said that the Board rightfully refused to consider the evidence relating to the value of good will as of March 1, 1913. In the reorganization agreement this asset was transferred with all other tangible and intangible property pertaining to or growing out of the wholesale drug business. No special value was fixed for this item, but that, in our opinion, does not foreclose the parties from showing its value, as it was actually transferred. Corporations frequently do not set up on their books of accounts a value for good will. Many of them carry it at the sum of $1, but in the determination of actual values there is no reason why the parties should not be allowed the benefit of the value of the property right represented thereby. The evidence in this connection shows that the company was at all times a prosperous going concern from and after its incorporation in 1893. It never had an operating loss. Its only losses were sustained by what were probably ultra vires actions in loaning money to certain individuals. The minute book of the Schuh Drug Company received in evidence shows a balance sheet and income statement for each of the years from 1903 to 1913, allowance of salaries to the corporate officers, and the amount of the earnings, capital stock, and surplus. The company made substantial profits; it could have paid dividends in all those years, and did pay dividends in each of the years from 1907 to 1911 at 6 per cent., and in 1912 at 10 per cent. The average net profits for each of these years was $15,556.53 whereas a 7 per cent. net return on invested capital would have been $7,310.45. In other words, the average net income for each of the years was almost 15 per cent. of the invested capital.

The evidence disclosed further that the business was stable; that as to over 70 per cent. of the merchandise sold, proprietary in character, the sale price was fixed by the manufacturers; that the business was not hazardous, with the prices of its wares rising and falling with resulting losses on account of inventories; that the company sold drugs, chemicals, and toilet articles; that its customers were selected retailers of drugs who were deemed of higher class than average retail merchants; that fluctuation in the market for drugs and chemicals is not great; and other facts giving a history of an established prosperous going concern over the years, with growing net profits, growing surplus, and invested capital and increasing business. This evidence was all undisputed and bore directly upon value of the good will. It was arbitrarily rejected by the Board. The petitioner offered the testimony of a witness who followed a stated formula and made a calculation of the value of good will based upon such formula and demonstrated and offered testimony of the value of the good will as $68,716.58. This, the witness said, under proper circumstances, he thought, should be at least $68,000 but under no circumstances less than $50,000. In Pfleghar Hardware Specialty Company v. Blair, Commissioner, 2 Cir., 30 F.2d 614, 617, the court said: "The value of tangible assets in the business, the annual net income for a series of years ending December 31, 1912, and the non-hazardous character of the business having been proved, the value of good will on March 1, 1913, can be established by applying the recognized formula. It is urged that no witness testified as to the value of the good will in 1913. In the absence of an actual sale, such testimony of value can be but an opinion, and can only be formed by taking into account the same financial history as the board had before it, and applying some such formula as that approved by the Tax Bureau. The absence of opinion testimony is not, therefore, important."

There is no specific rule for determination of the value of good will. Each case must be considered and determined in the light of its own particular facts. The Board erred in refusing to receive the testimony of the value of good will calculated according to a well-recognized formula, but in the absence of such testimony it is apparent that these undisputed facts indicated a valuable good will; and it was the duty of the Board, when it did not receive the formula, to apply its own knowledge to these facts and make the calculation itself. Yet it expressly held that there was no evidence of the value of good will.

The Board further held that it could not attribute any value to good will because there was no evidence of value of tangible assets. As we have shown, counsel for the Commissioner conducted the examination upon the assumption that the values shown in the exhibits were correct;

nobody ever questioned this fact, and the exhibits themselves indicated book value, and in case of inventory, market, or cost, whichever was less. There was evidence of value. Consequently, in determining the value of all assets, transferred, it was necessary to include that of good will.

■ The Commissioner asserts, although no such contention was made before the Board, that no reorganization resulted because the assets of the Schuh Drug Company were transferred to the Fuller-Morrison Company, and McKesson & Robbins was not, therefore, a party to a reorganization. The contract provided that the transfer should be made to McKesson & Robbins "or its nominee." Fuller-Morrison Company was designated as such nominee. It is a wholly-owned subsidiary of McKesson & Robbins. The word nominee ordinarily indicates one designated to act for another as his representative in a rather limited sense. It is used sometimes to signify an agent or trustee. It has no connotation, however, other than that of acting for another, in representation of another, or as the grantee of another. Why McKesson & Robbins, who made the contract to take the property and who issued and delivered all the consideration for such transfer, should have named Fuller-Morrison Company as its nominee, the record does not show. The latter may have been its agent, its trustee, its grantee. One thing is clear, viz., that the principal, McKesson & Robbins, made Fuller-Morrison Company its representative to receive for it what was due it. The mere fact that McKesson & Robbins, the active party to the contract of reorganization, directed that the assets should be transferred to its nominee instead of directly to itself in nowise detracts from the fact that McKesson & Robbins contracted to receive and did in fact receive through its nominee that which it contracted for. In this respect the case is to be distinguished from Bus & Transport Securities Corp. v. Helvering, 296 U.S. 391, 56 S.Ct. 277, 80 L.Ed. 292, and Groman v. Commissioner, supra, relied upon by the Commissioner. In the former, neither party to the exchange required any definite immediate interest in the other, and in the latter, Glidden transferred nothing to the stockholders of the Indiana company, whereas in the present case McKesson & Robbins transferred to the petitioners everything the latter received. The exchange was between Schuh Drug Company and its shareholders on the one hand and McKesson & Robbins on the other, and if the latter had some reason for directing that the conveyance be made to its agent or representative, nominee, or grantee, that was no concern of the petitioners. Clearly, under the evidence in this case, McKesson & Robbins was a party to the reorganization.

Much we have said is material also upon another question involved, namely, that if there was no reorganization, the transaction resulted in no gain to the petitioners. The agreed amount of value of the tangible assets transferred must be increased by the sum of at least $50,000, as the value of good will, and, when this addition is made and proper computation is made of the value of the stock received, no taxable gain resulted. The Commissioner, without taking into consideration the good will, found a gain of some $48,-745.

■ The further question bearing directly upon this inquiry is as to the value of the stock received. The shares of McKesson & Robbins delivered to petitioners were bound by the restriction that they should not be disposed of within six months after receipt thereof. The Commissioner placed a value upon them as of the date of the transfer in April, 1929. On October 29, 1929, the stock exchange values were $40 for the preference stock, and for the common stock $26. If we adopt this valuation of the securities received, there was no gain, but rather, a loss.

We think the later valuation should prevail, first, because the evidence shows that the book value of the common stock was $21 instead of the value fixed by the Commissioner. In the second place, the evidence shows that McKesson & Robbins was a new corporation, just starting on a plan of gathering together some sixty odd wholesale drug companies, scattered over the entire country; that the company had had no experience in the operation of such business; that its officers had had no such experience; that its future was wholly unknown; that its stock was unseasoned; and whether it would be of real value was a question wholly for the future. In such situation we are not bound to say that the actual value of the stock was that then shown on the stock exchanges. And we have the further fact that the stock was not salable because of the restriction. If

412

it was not salable, there was no market for it. There was, therefore, no market value until the restriction should be removed. As we have shown, evidence as to subsequent events is material in testing the propriety of the valuation, and as the Supreme Court said in Helvering, Commissioner, v. Tex-Penn Oil Co., supra, under the peculiar circumstances of this case, regard being had to the speculative quality of the stock and to the terms of a restrictive agreement making sale impossible, it did not have a market value capable of being ascertained with reasonable certainty when acquired by the taxpayers. The Circuit Court of Appeals, in deciding Tex-Penn Oil Company v. Commissioner, reported in 3 Cir., 83 F.2d 518, commented at some length upon this same subject, saying that, under such facts, to fix within a certainty any real value for income purposes was impossible. The Board ignored all of the testimony in this respect, and in this it was in error.

■ We conclude that the undisputed evidence sustains a finding only that that which was received by the petitioners were the following items: Cash, $562.19; 3,877 shares of the common stock of McKesson & Robbins of the value of $26 per share, $100,802; 2,131 shares preferred at $40 per share, $85,240; or total receipts of $186,042 as against $281,748.08, found by the Commissioner to have been the cost of what was transferred. Consequently, the petitioners experienced a loss rather than a gain. Furthermore, the amount of receipts must further be reduced, in arriving at the true amount of what was received, by the sum repaid by the Schuh Company on notes and accounts guaranteed in the amount of $21,124.51, for, in the end, this had to be repaid, and hence was not received. So the total receipts eventually were $164,917.49, which, when deducted from the Commissioner's finding of cost of assets, leaves a still greater deficit or loss to the petitioners. Considering the actual value of the securities received and allowing the actual value of good will which the Board refused to do, the transaction becomes one in which there was no gain, Pfleghar Hardware Specialty Co. v. Blair, 2 Cir., 30 F.2d 614. We call attention here to the fact that in this connection the Board relied upon Propper, 33 B.T.A. 261, and that this decision was reversed by the United States Circuit Court of Appeals in Propper v. Commissioner, 2 Cir., 89 F 2d 617.

We conclude, therefore, that under all the evidence before the Board it was not justified in finding that substantially all of the property of the corporation was not transferred; that it should have found that there was a reorganization; and that in the event it did not, it should have found that the transaction resulted in no gain.

The decisions are reversed.