## COOPERATIVE PUB. CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9438.

Circuit Court of Appeals, Ninth Circuit.

Dec. 3, 1940.

Geo. H. van de Steeg, of Nampa, Idaho, for petitioners.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, F. E. Youngman and Howard D. Pack, Sp. Assts. to the Atty. Gen., for respondent.

Before WILBUR, HANEY, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

Petitioners seek to review a decision of the Board of Tax Appeals, 40 B.T.A. 466, upon its appeal from the determination of the petitioner's tax by the Commissioner. The question involved arises out of a foreclosure sale of all the assets of the petitioner, tangible and intangible, for $36,600. The Commissioner claims that this sale resulted in a taxable capital gain of $20,944.94. In estimating the gain he allowed no deduction whatever from the sale price for the cost of the intangible assets. The Board held that the presumption in favor of the action of the Commissioner was not overcome by the evidence adduced before it and approved his estimate of gain.

In order to consider the questions involved it will be necessary to state the facts disclosed by the record somewhat at length. There is no dispute in the evidence.

In 1918 the Cooperative Publishing Company, petitioner herein, was organized for the purpose of printing and circulating a daily newspaper at Nampa, Idaho, known as the "Idaho Free Press". The common stockholders invested in the enterprise some $23,645 and the preferred stockholders invested $1,895. These stockholders have never received a penny dividend. In order to conduct the business of the corporation money was borrowed which was secured by a mortgage upon the property of the corporation. This mortgage was foreclosed and the property sold by the sheriff on August 7, 1937, for the sum of $36,600.

The Board of Tax Appeals, in its findings of facts, declared that the purchase price was distributed by the sheriff as follows:

| | |
|---|---|
| "Sheriff's fees | $ 1,291.15 |
| Principal and interest on second mortgage | 776.71 |
| Bondholders' principal and interest | 27,512.39 |
| Publication notices | 22.12 |
| Clerks' fees | 7.63 |
| To the petitioner | 6,990.00 |
| Total | $36,600.00" |

It found that the number of subscribers to the newspaper on the date of sale was 2,500; that the purchasers continued the publication without omitting an issue and that almost all the subscribers continued their subscriptions after the sale; that the petitioners had always operated at a loss, never declaring dividends; the deficit on December 31, 1936 was $36,383.52; that on December 31, 1937, after applying the proceeds of sale this deficit was $18,738.86; that there were then assets of $11,368.49 and liabilities of $30,107.35, as follows:

| | |
|---|---|
| "Accounts payable | $ 2,618.52 |
| Accrued wages | 400.00 |
| Notes payable | 1,548.83 |
| Preferred stock | 1,895.00 |
| Common stock | 23,645.00 |
| Total | $30,107.35" |

These figures indicate that when the debts were paid and the preferred stock satisfied from the $6,990 paid to the petitioners by the sheriff, nothing would be left for the common stockholders who had invested $23,645 and received no interest or dividends for a period of about twenty years. The tax fixed by the Board of Tax Appeals for the year 1937 amounted to $4,080.44. The method by which this result was reached was stated by the Board as follows:

"The respondent determined that the petitioner had realized a gain of $22,265.84 by deducting from the sale price of $36,600 an adjusted cost basis of $14,334.16 for tangible assets. He deducted no amounts as the cost of subscription lists or good will. The petitioner's books contain no entries or accounts showing the cost of good will, of acquiring circulation or of

obtaining subscription lists.[1] All expenditures were charged to operating expenses and deducted on the petitioner's income tax returns. The petitioner's ledger account showed the adjusted cost basis of its tangible assets as $14,334.16 and the sale price of its assets as $36,600, producing a net realized gain therefrom amounting to $22,265.84. Expenses of sale, aggregating $1,320.90, reduced the net gain to $21,944.94. The petitioner's income tax return for 1937 showed a deficit of $5,801.39."

It appears from the record that by "adjusted cost basis" is meant the cost of the machinery and equipment, $32,307.83 less the depreciation of $19,850.64 thereon claimed and allowed on previous tax returns of the petitioner, leaving a balance of $12,448.19, and $1,507.06, the cost of the furniture and fixtures, less depreciation claimed and allowed thereon of $869.07, leaving their adjusted cost of $637.99 which, together with news print ink and metal appraised July 31, 1937, at $1,247.98, without depreciation, makes a total adjusted cost of $14,334.16. In the opinion of the Board it is said:

"The basic question relating to the year 1937 is whether or not a taxable gain was realized by the petitioner upon the forced sale of its assets on August 7 of that year. The respondent determined that the petitioner had realized such a gain, amounting to $22,265.84, by subtracting from the purchase price the adjusted cost basis of the tangible assets. In his computation, he ignored such intangible assets as good will, the cost of securing subscriptions, and of increasing circulation, the value of publishing legal notices, etc. He also failed to allow the expense of the sale, amounting to $1,320.90, which he now concedes to be a correct deduction. The net gain in question, therefore, is reduced to $20,944.94.

"The petitioner contends that the cost of the good will and other intangibles was greater than the difference between the adjusted cost basis of the tangible assets and their sale price. The petitioner's books do not support this theory. They contain no account showing any cost of securing subscriptions or increasing circulation or of any other intangible item generally classified as 'good will.' The petitioner argues, however, that the stockholders' and bondholders' investments, loans and accounts payable, less depreciation taken, amount to over $38,000 and that, since no dividends were ever paid to the stockholders, its invested capital was used and absorbed to produce and preserve its assets and, consequently, such capital represents the cost of the intangibles, after the adjusted cost of the tangible assets is deducted.

"The fallacy of this argument is manifest from the fact that it gives no consideration to losses incurred in almost 20 years of operation, to mismanagement, and to many other such factors which might retard instead of develop good will. Cost must be proved with reasonable accuracy. In the absence, therefore, of any positive and satisfactory proof of the cost of the intangibles, we must sustain the respondent's action."

The petitioners admit that the books of the corporation do not contain any account showing or attempting to show the cost of the good will. They say:

"The items properly constituting the cost of producing the goodwill do not appear in the record of this case, and whether or not the same could at this date be dug out of the books and records of the corporation with any degree of certainty, the record of this case does not show."

Evidence of Cost of Intangible Assets.

The undisputed evidence relied upon by the petitioners to show the cost and value of good will, subscription lists, etc., is substantially as follows:

Bernard Mainwaring, one of the purchasers at the sheriff's sale, testified that in his opinion at the time of the purchase the physical assets which he purchased were worth no more than $15,000 and that he paid the balance of sale price of

---

[1] "Art. 22 (a)-10. Sale of good will. Gain or loss from a sale of good will results only when the business, or a part of it, to which the good will attaches is sold, in which case the gain or loss will be determined by comparing the sale price with the cost or other basis of the assets, including good will. (See articles 111-1, 113 (a)(14)-1, 113 (b)-1, and 113 (b)-2. If specific payment was not made for good will there can be no deductible loss with respect thereto, but gain may be realized from the sale of good will built up through expenditures which have been currently deducted. It is immaterial that good will may never have been carried on the books as an asset, but the burden of proof is on the taxpayer to establish the cost or other basis of the good will sold."

$21,600 for the subscription list, the name, the good will, and the opportunity to get into the newspaper business in Nampa; that he would estimate the value of the good will at the time of the sale as $20,000. He was asked to give an estimate of the cost of obtaining a circulation figure of 2,500 and replied it would cost at least $25,000 and probably more.

J. T. La Fond, a newspaper man of Nampa, Idaho, who had been in the business thirty years, and for 2½ years had managed the petitioning corporation and had for twelve years been connected with it, bid $36,500 at the sheriff's sale. His competitor raised that bid $100 and got the property. He estimated the value of the good will at the time of the sale at between $25,000 and $30,000 and the tangible assets sold at $15,000. He also testified that all the money which the corporation received from all sources went back into the business and was used to produce the assets which were sold by the sheriff; that the company had operated with a deficit from the beginning.

Rufus D. Moore, a public accountant residing in Nampa, Idaho, testified that at various times he had done accounting work for the company. In 1930 he examined the records of the company from its origin to date; that in 1932 he made an audit extending to January 1, 1933, and that he had since examined the records in connection with bonds. He testified he was considered the standing consultant for the bookkeeping and management of the company. He testified there were no specific items showing on the books the cost of good will and no specific entries that would show what the cost was to the company of the production of good will; that no dividends were ever paid, no stockholder ever received back any part of his investment. This witness also testified as follows:

"In view of the fact taken from this report itself [Costello's report] nothing ever having been distributed to the stockholders, shows that the adjusted cost of tangible assets together with the operating cost of building and maintaining intangible assets to be approximately $54,000.00. All assets being sold, both tangible and intangible, for $36,600.00 shows that there was an actual loss from the sale amounting to $18,738.86."

The witness stated that the money received from the sale of assets was merely a partial return of invested capital; that the cost of the intangible assets sold was $41,004.70. In explanation of this latter figure the witness stated:

"The fact that no capital had ever been returned to investors, it is a simple accounting fact that the difference between an opening balance sheet and the closing balance sheet reflects a profit or loss, and in this case it is a loss. * * * the $41,004.70 was not based on records of cash disbursements." He stated the company had never made any money, always been in the red, always had a deficit.

Harry Cochrane, secretary and treasurer of the Caldwell News Tribune at Nampa, Idaho, had been connected with petitioner for two years, and had assisted in the preparation of the tax return wherein the cost of the good will of petitioner had been fixed at $22,265.84, being the difference between the selling price and the value of the fixed assets depreciated. He testified the cost of the good will would be more than that amount and that he used the figure $22,265.84 as the cost of the good will in order to show that there was no gain upon the sale of the capital assets. He stated the company always operated with a deficit and that as early as 1922 they had a deficit of $14,000 which had increased from that time forward.

■■ It will be observed that the foregoing evidence is to the effect that the good will was worth between $20,000 and $25,000, and that it would cost that much to procure a single item of good will, namely the 2,500 subscribers. This testimony was given by a competent newspaper man familiar with the affairs of the paper he purchased and was backed up by a bid in which $21,600 was apportioned to the good will of the business. While the accountants agreed that there was no specific account set up for good will or for the cost thereof, all the moneys received by the company had been invested in the newspaper business, resulting in the paper established for nearly twenty years with a circulation which had grown to 2,500, with an established advertising business, including legal notices, for which about $300 per month was received by the publisher. The stockholders had acquired the good will by the investment which they had made in the corporation. It appears from the record that they have nothing else. It is difficult to escape the conclusion that the cost of the good will,

subscription lists, etc., exceeded the price paid for it. It, however, is not our function to determine the cost of the intangibles. That is a matter for the Board of Tax Appeals. But that a substantial amount should be deducted as a cost thereof is beyond question and the refusal to make some appraisal thereof is arbitrary and unreasonable. Cf. Nachod & United States Sign Co. v. Helvering, 6 Cir., 74 F.2d 164, 167 par. 7, 169 ·par. 13.

■ We cannot subscribe to the statement of the Board above quoted that the claim of petitioners to deduction is manifestly fallacious because "it gives no consideration to losses incurred in almost 20 years of operation, to mismanagement, and to many other such factors which might retard instead of develop good will." There is no showing that the corporation suffered any loss in its business other than that resulting from the normal task of establishing a newspaper with a fairly large circulation; there is no evidence of any mismanagement of the corporation, nor of other factors which might retard instead of develop good will. The testimony of the experts who examined the books implies that there was no such mismanagement. Moreover, if expenditures were made for the purpose of creating good will, the fact that they were ill advised and unproductive and may have retarded rather than promoted the desired end, would not alter the fact that such expenditures were a part of the cost of the good will. The views we have expressed are in accord with the decision of Schuh Trading Co. v. Com'r, 7 Cir., 95 F.2d 404, 410, par. 12, 13.

■ Also, petitioners claim exemption under the provisions of § 14(d) (2) of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev. Acts, page 824, which exempts from surtax on undistributed profits "domestic corporations which for any portion of the taxable year are in bankruptcy under the laws of the United States, or are insolvent and in receivership in any court of the United States," etc. It is conceded that the petitioner does not come within the terms of this statute but it is contended that it was insolvent and was virtually in receivership because it might have been placed therein in a foreclosure case, and it is being liquidated by its directors. This position cannot be maintained. In order to claim an exemption the corporation must come within the language of the statute creating exemption.

■■ Petitioners next claim that under § 26(c) (1) of the Internal Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 836, no surtax could be charged because the law of the state prohibited the payment of dividends by the corporations having a deficit (Idaho C.A. §§ 29-129, 29-130). The case of Crane-Johnson Company v. Helvering, 8 Cir., 105 F.2d 740, affirmed by the Supreme Court on November 12, 1940, 61 S.Ct. 114, 85 L.Ed. ——, settles the question adversely to the petitioner. The decision of this court in Northwest Steel Rolling Mills v. Com'r, 9 Cir., 110 F.2d 286, was reversed by the Supreme Court on the same day, 61 S.Ct. 109, 85 L.Ed. ——. We also hold that the execution of a mortgage contract did not constitute a contract not to pay dividends by its implied adoption of the statutory law.

■ Petitioners contend that inasmuch as the only amount received by it from the sheriff's sale was $6,990, the maximum amount for which it could be taxed upon income is $6,990 under the provisions of 26 U.S.C.A. Int.Rev.Code, § 112(f). We cannot see that this statute has any application to a foreclosure sale. That section deals with the destruction of the property in whole or in part, its theft or seizure,. or the exercise of the power of condemnation, or the threat or imminence thereof. The government's contention is that because a portion of the fruits of the sheriff's sale are devoted to the payment of the mortgage indebtedness it does not alter the fact that the purchase price represents a profit to the corporation which is taxable. We concur in this view if such a profit is shown. Income may be realized although not actually received. United States v. Hendler, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018; Helvering v. Horst, 61 S.Ct. 144, 85 L.Ed. ——, decided November 25, 1940.

■ The order of the Board of Tax Appeals is reversed with direction to redetermine the taxable gain resulting from the sale, by allowing as a deduction, the cost of acquiring the subscription list, good will and other intangibles sold by the sheriff, as well as the cost depreciated of the tangible assets, in accordance with its judgment under the evidence, without relying upon the presumption. in favor of the Commissioner's finding that such assets had no cost, as that presumption was fully overcome by the evidence. See, Wiget v. Becker, 8 Cir., 84 F.2d 706, 707 § 3; Sea-

side Improvement Co. v. Comm'r., 2 Cir., 105 F.2d 990, 993 § 8; New York Life Ins. Co. v. Gamer, 303 U.S. 161, 58 S.Ct. 500, 82 L.Ed. 726, 114 A.L.R. 1218.

Reversed.