DEAN J. GUINTOLI AND GEORGINE GUINTOLI, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3994–66, 3996–66, 3998–66, 4000–66, 4002–66, and 4004–66. Filed November 5, 1969.

*Joseph H. Trethewey*, for the petitioners.
*Walter John Howard, Jr.*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in income tax in these consolidated proceedings for the calendar year 1962 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 3994–66 | Dean J. Guintoli and Georgine Guintoli | $4,696.37 |
| 3996–66 | Robert H. Humber and Dorothy Humber | 4,312.28 |
| 3998–66 | Jerome P. Firnstahl and Dorothee Firnstahl | 2,787.99 |
| 4000–66 | Fred J. Kolash and Beverly Kolash | 4,285.11 |
| 4002–66 | William R. Ney and Carol B. Ney | 3,836.38 |
| 4004–66 | Rellen O. Skelton and Ruth M. Skelton | 4,223.63 |

---

[1] Cases of the following petitioners are consolidated herewith: Robert H. Humber and Dorothy Humber, docket No. 3996–66; Jerome P. Firnstahl and Dorothee Firnstahl, docket No. 3998–66; Fred J. Kolash and Beverly Kolash, docket No. 4000–66; William R. Ney and Carol B. Ney, docket No. 4002–66; and Rellen O. Skelton and Ruth M. Skelton, docket No. 4004–66.

The sole issue for decision is whether the petitioners are entitled to deductions claimed for amortization of a license to operate food concessions in the Seattle World's Fair of 1962.

## FINDINGS OF FACT

The petitioners in each docket number are husband and wife. At the time of filing the petitions herein, William R. Ney and Carol B. Ney resided at Maple Valley, Wash., and the other petitioners resided in Seattle, Wash. Each couple filed a joint income tax return for the calendar year 1962 with the district director of internal revenue at Tacoma, Wash.[2] The husbands will be referred to as the petitioners.

Century 21 Exposition, Inc., herein referred to as Century 21, was a corporation formed to operate a World's Fair at Seattle, Wash., in 1962. Pursuant to contracts previously entered into with the Bureau of International Expositions in Paris, France, and with various foreign governments, Century 21 was required to limit the duration of the fair to 6 months. The fair was operated from April 21 to October 21, 1962, both inclusive.

Tasty Food Shops, Inc., a Washington corporation, hereinafter sometimes referred to as the corporation, was organized by the petitioner, Dean J. Guintoli, on April 26, 1961. Prior thereto, on April 6, 1961, Guintoli, on behalf of Tasty Food Shops, Inc., had entered into a license and space agreement with Century 21 to operate adjoining concessions for the sale of specified items of food in the food pavilion of the exposition, during the period of the exposition commencing April 21, 1962, and terminating October 21, 1962.

The space agreement provided in part as follows:

THIS AGREEMENT, made and entered into this 6th day of April, 1961, by and between CENTURY 21 EXPOSITION, INC., a Washington corporation of 312 First Avenue North, Seattle, Washington, hereinafter called "Licensor," and TASTY FOOD SHOPS, INC., 7740 Bagley Street, Seattle, Washington, hereinafter called "Licensee."

WITNESSETH: In consideration of the mutual terms, provisions and conditions herein contained and attached hereto, the parties hereto represent, warrant and agree as follows:

DEMISE. Licensor is in the process of developing an international exposition called "Century 21 Exposition" (hereinafter called the Exposition) on the property in the City of Seattle, County of King, and State of Washington, more particularly described as the Civic Center Site.

Licensor hereby agrees to license and the Licensee agrees to hire and occupy from Licensor the premises in the Exposition generally described as follows, and hereinafter called the "Premises:"

---

[2] Robert H. and Dorothy Humber (docket No. 3996–66) filed an amended joint return for 1962 wherein they claimed itemized nonbusiness deductions in the amount of $1,597.91 in lieu of the $1,000 standard deduction. In his notice of deficiency, respondent determined these petitioners were entitled to the itemized deduction so claimed.

Floor space in Exposition building now known as the Food Pavilion, the exact location to be agreed upon at a later time,

containing approximately 550 square feet, together with a non-exclusive right of ingress and egress to be used in common with others to and from a public street.

USE OF PREMISES. Licensee warrants and agrees that it will use the Premises for the following purposes only:

As adjoining concessions, selling at retail cube steak sandwiches in one location, and in the other beef sandwiches and corned beef and cabbage dinners. Quality and quantity standards subject to approval of Licensor.

LICENSE FEES. In consideration of the issuance of this License, the Licensee upon execution hereof agrees to pay the fees herein set forth:

(1) A total license fee in the amount of Six Thousand Eight Hundred and Seventy Five Dollars ($6,875.00), Three Thousand ($3,000.00) of which is payable upon the execution of this agreement and receipt therefor is hereby acknowledged by Licensor. The balance of the total license fee shall be paid on or before October 21, 1961. (All drafts and checks shall be made in U.S. currency, payable to Century 21 Exposition, Inc.)

This license fee shall be applied as an advance against the Concession Percentage over the first twenty-two (22) weeks of operation in accordance with the following schedule:

| Period | Weeks | Percent of total |
|---|---|---|
| 1 | 1–4 | 10 |
| 2 | 5–8 | 15 |
| 3 | 9–12 | 20 |
| 4 | 13–16 | 25 |
| 5 | 17–20 | 25 |
| 6 | 21–22 | 5 |
| Total | | 100 |

(2) A service fee of twenty two cents (22¢) per square foot per four-week period starting on the opening day of the Exposition which covers security, landscape maintenance, garbage and trash disposal, employee access identification media, medical aid, customs guards (if required), optional use of the Exposition's Personnel Department in securing employees, electrical utilities (to maximum consumption of 10 watts per square foot), water at normal pressure, gas (heating requirements only), exhibit janitorial services, including sweeping, dusting, mopping, general seven-day a week light housekeeping, clean-up work, periodical waxing of floors, window washing, and such additional services which Licensor may later include.

(3). An additional service fee to be subsequently determined by Licensor, which will be assessed for the term of this agreement covering bussing services, use of facilities in common eating areas, dish washing and general entertainment, where provided. Such fee will be determined on an equitable basis of assessment for all pavilion licensees.

CONCESSION PERCENTAGE. If Licensee is engaged in connection with Century 21 Exposition, Inc., in any occupation, operation, or concession from which said Licensee shall receive receipts, income or other revenues from such undertaking, Licensee shall pay to Licensor *ten* percent (10%) of daily gross receipts, if any, derived from all such sources in the operation and/or maintenance of said concession or exhibit or anything incident or pertinent thereto.

EXCLUSIVITY. Only the corned beef and cabbage dinners and sandwiches and cube steak sandwiches of Licensee will be sold in the Food Pavilion so long as Licensee is in possession of, and this License is effective in regard to the Premises. Except as specifically provided in this Article, Licensee shall have no rights of exclusivity. Nothing herein shall prevent the serving of the above food items in the Food Pavilion by one (1) other Licensee in the course of a general restaurant operation.

IMPROVEMENTS. Licensor will be obligated to provide the Premises with only the following: Utilities as required pursuant to Paragraph XI hereof.

DEMOLITION PERFORMANCE BOND. Licensee agrees to deposit with the Exposition a bond in the form acceptable to Licensor in the amount of Two Hundred Seventy Five Dollars ($275.00) at least five (5) months prior to the opening of the Exposition.

*  *  *  *  *  *  *

TERMS OF GENERAL LICENSE AGREEMENT. Licensee further agrees to and there is incorporated herein the additional terms and conditions of the General License Agreement contained in Exhibit "B" hereof which constitute and are hereby made a part of this agreement.

The general license agreement provided in part, as follows:

## II

TERM. The term of this License shall be for a period commencing upon the opening date of the Exposition, April 21, 1962, and terminating on October 21, 1962. The "opening date of the Exposition" shall mean the date upon which the Exposition will have officially opened to the general public, it being presently contemplated that that date will occur on April 21, 1962. Licensor will use its best efforts to cause such opening to occur on said date, but will not be responsible or liable in any way by reason of its failure or inability for any reason so to do.

Licensee will have the right after June 15, 1961, without charge, to occupy the Premises for the purpose of installing improvements and equipment as hereinafter provided. Licensor shall, during such period, have all the rights it has during the term of this License and Licensee shall perform all of Licensee's obligations assumed under the terms of this License.

*  *  *  *  *  *  *

## XVII

ASSIGNMENT, TRANSFER, LIEN. Licensee shall not have the right to assign the whole or any part of the Premises, nor to assign, transfer or encumber in any manner this License nor any right, privilege or interest conferred hereby, in whole or in part, to any person, firm or corporation whomsoever.

Neither this License, nor any right, privilege, license or interest conferred hereby, shall be transferable by operation of law, by reason of any bankruptcy act, insolvency, receivership, receivership proceedings, attachment, execution, other judicial process or sale by or against Licensee, whether any of the same be voluntary or involuntary or judicial proceedings, or not.

By an amendment dated April 14, 1962, Tasty Food Shops, Inc., as licensee, was granted an additional 400 square feet of floor space within which to sell additional specified items of food and beverages on a nonexclusive basis, for which the corporation paid an additional

"license fee" of $5,000 to be applied as an advance against concession percentages of gross sales according to a schedule identical with the one in the original agreement.

Upon organization of the corporation, Guintoli received 5,000 shares of its stock. He later returned 2,500 shares to the treasury. The other petitioners, Humber, Firnstahl, Kolash, Ney, and Skelton, each received 2,500 shares of stock of the corporation, for which they paid $2,500, respectively.

In 1961, Guintoli was employed by Century 21 as a staff assistant with duties of negotiating contracts and later as assistant director of the Concessions Division. It was an inviolate rule of Century 21, which was strictly enforced, that no employee or member of his family could directly or indirectly have any interest in any concession at the fair. After he became an employee, Guintoli transferred the 2,500 shares of the stock of the corporation which he owned to Phillip R. Roppo, and by letter dated October 21, 1961, advised A. Cooperstein, the comptroller of Century 21, that he would "no longer be associated with Tasty Food Shops, Inc." Roppo was a cousin of Guintoli's wife, Georgine Guintoli, and merely acted as agent or nominee of Dean J. Guintoli. Guintoli remained the real owner of the shares in Roppo's name. All checks thereafter received by Roppo from the corporation, or the partnership hereinafter mentioned, were endorsed by him and were endorsed and cashed by Georgine. Guintoli paid Roppo $1,000 for acting as his agent or nominee.

Fred Kolash became president of Tasty Food Shops, Inc., in March 1962. Ney was secretary and treasurer of the corporation and managed the operation of the concessions for the corporation and the partnership.

The Seattle World's Fair opened on April 21, 1962, and ended October 21, 1962, as scheduled. The operation of the food concessions granted to it were conducted by the corporation during the first 10 days of the fair. A valid Form 2553, accompanied by the stockholders' consents, electing to be taxed as a small business corporation effective May 1, 1962, was timely filed and thereafter during the months of May and June 1962, the business was conducted as a small business corporation.

On June 22, 1962, a resolution was adopted by all the shareholders of the corporation to dissolve the corporation and divide the capital and surplus among the shareholders. Fred Kolash was appointed trustee for the dissolution. Notice of the Resolution for Voluntary Dissolution of the corporation was filed with the secretary of state for the State of Washington on June 25, 1962, and a return of information (Form 966), was filed with the district director of internal revenue

at Tacoma, Wash., on July 9, 1962. Kolash, as liquidating trustee, executed an "assignment of franchise and rental agreement" and a bill of sale, on June 28 and July 2, 1962, respectively, transferring the franchise and equipment in equal parts to the six shareholders, including Roppo acting as agent and nominee of Guintoli.

A corporation income tax return (Form 1120) for the period June 12, 1961, to April 30, 1962, inclusive, was filed on behalf of the corporation by Kolash, as liquidating trusteee, on July 16, 1962. This return reported gross receipts of $23,947.68, taxable income in the amount of $7,135.19, and income tax in the amount of $2,140.56.

A small business corporation return of income (Form 1120–S) for the period May 1, 1962, to October 1, 1962, was filed on behalf of the corporation by Kolash, as liquidating trustee, on October 16, 1962. It is marked "Final Return" and reported gross receipts of $147,004.30, and taxable income in the amount of $50,101.57. In a statement attached to the final return, the share of each shareholder of record in the undistributed taxable income ($50,101.57) is shown as $8,350.26. Nondividend distributions, to each of the six shareholders 'of record are shown as follows:

| 7/1/62 | Fixed assets | $1,047.70 |
| 7/1/62 | Franchise | 20,000.00 |
| 6/30/62 | Cash | 7,000.00 |
| 10/1/62 | Cash | 3,635.00 |

The total value of the "Franchise" allegedly distributed to the six shareholders was $120,000.

The shareholders to whom the assets of the corporation were transferred organized a partnership under the name "The Tasty Food Shop" and operated the concessions granted the corporation beginning July 1, 1962, until the end of the fair on October 21, 1962.

The partnership used new checks with the partnership name, "The Tasty Food Shop," printed thereon, with which to pay Century 21 the fees and charges connected with the operation of the concessions. The same bank account number (12510189) was shown on both the corporation and the partnership checks and the cash "non-dividend distributions" referred to above were made with checks imprinted with the corporate name. All bills submitted by Century 21 continued to be addressed to the corporation. The record does not disclose that the administrative officials of Century 21 were advised of the dissolution of the corporation or of the transfer of its assets to its shareholders. No new license or space agreement for operation of the concessions was ever executed between Century 21 and the partnership.

A partnership return of income (Form 1065) for the period July 1, 1962, to December 31, 1962, was filed in February 1963. The return was

signed by Fred J. Kolash, one of the partners, and reported gross receipts in the amount of $293,975.46, and total income in the amount of $200,479.77. Total deductions claimed were $210,715.26 and a loss of $10,235.49 was reported. The deductions claimed included amortization of the "World's Fair franchise" at $120,000 and of "Leasehold improvements" at $3,349.65, both shown as acquired July 1, 1962, and having a life of 4 months. The loss shown on the return was allocated $1,705.91 (or $1,705.92) to each of the six partners, including Roppo, who was the agent or nominee of Guintoli. Reconciliation of partners' capital accounts was shown as follows:

| | Capital contributed during year | Ordinary income (loss) | Withdrawals and distributions | Capital account at end of year |
|---|---|---|---|---|
| Fred J. Kolash | $21,047.70 | ($1,705.91) | $18,500 | $841.79 |
| Jerome P. Firnstahl | 21,047.70 | (1,705.91) | 18,500 | 841.79 |
| Phillip Roppo | 21,047.70 | (1,705.92) | 18,500 | 841.78 |
| Rellen O. Skelton | 21,047.70 | (1,705.92) | 18,500 | 841.78 |
| William R. Ney | 21,047.70 | (1,705.92) | 18,500 | 841.78 |
| Robert Humber | 21,047.70 | (1,705.91) | 18,500 | 841.79 |
| Total | 126,286.20 | (10,235.49) | 111,000 | 5,050.71 |

In their returns for the calendar year 1962, each of the petitioners reported long-term capital gain on 2,500 shares of Tasty Food Shops, Inc., stock, shown as acquired October 28, 1961, and sold October 1, 1962, for a gross sales price of $31,682.70. Each of the petitioners, except Firnstahl, reported the cost of the stock as $10,850.26 and the gain as $20,832.44. Firnstahl reported the cost as $2,500 and the gain as $29,182.70. Each of the petitioners reported income from the subchapter S corporation in the amount of $8,350.26 and a loss from the partnership in the amount of $1,705.91 (or $1,705.92). Humber and Ney reported the receipt of wages from the corporation and the partnership. Guintoli reported wages received from Century 21 and the income from the stock held in Roppo's name.

The space agreement dated April 6, 1961, as amended April 14, 1961, and the general license agreement incorporated therein had no cost basis to the corporation. They were not transferable by the corporation to any other person or entity and were not transferred to petitioners or their partnership upon liquidation of Tasty Food Shops, Inc., with a fair market value of $120,000 or any other value. Neither the petitioners nor their partnership had any amortizable basis in the space-license agreement.

OPINION

The six petitioners were all the stockholders of a corporation, Tasty Food Shops, Inc., which held a license or franchise to operate food concessions at the Seattle World's Fair of 1962. The business proved

successful. The corporation was operated as a small business corporation in May and June of 1962. The petitioners dissolved the corporation as of June 30, distributed its assets to themselves and formed a partnership to operate the concessions from July 1 to the end of the fair, October 21, 1962. They contend that, at the time of dissolution, the franchise had appreciated in value and had a market value of $120,000, that the partnership acquired the license at a value and basis of $120,000 and is entitled to amortize this basis over the remaining period of the fair. Consistent with this contention each of the petitioners reported on his income tax return for 1962 receipt of long-term capital gain on the assets distributed by the corporation in dissolution, including his share of the alleged value of the franchise at $20,000.

The operation of the business by the partnership resulted in an income of approximately $110,000 during the last 113 days of the fair. By deducting $120,000 for amortization of the franchise, the partnership reported a net loss of about $10,000 for this period instead of taxable income of $110,000. Each petitioner claimed a deduction for a prorata share of the loss shown on the partnership return.

Respondent disallowed the amortization deduction, increased each petitioner's taxable income by $20,000 on that account, and reduced by $10,000 the capital gain reported by each petitioner on liquidation of the corporation. Respondent determined that the right to the license agreement had no market value as of July 1, 1962. The net effect of these adjustments was to increase each petitioner's taxable income by $10,000.

Respondent contends that the license was not transferable from the corporation to the partnership. Under its terms the licensee had no right to assign or transfer the license or any right or privilege thereunder to any person, firm, or corporation. The purpose of this restriction was to assure Century 21 that it could control the concessionaires. There is no record that Century 21 was given written notice of the dissolution of the corporation or of the transfer from the corporation to the partnership of the license here involved. The petitioners' bookkeeper testified that she informed someone in the fair office of the change when she delivered checks to pay the rentals, and that the partnership used new checks imprinted with the partnership name to pay rentals and other expenses. If the partners had given notice to Century 21 or made request for a transfer of the license from their corporation to their partnership, there is no assurance that the transfer to the partnership would have been approved, particularly if all the facts had been disclosed, that is, that Roppo was a mere nominee of Guintoli and that by means of this subterfuge Guintoli,

an employee of Century 21, would share in the partnership profits, thereby defeating the fair's policy against conflict of interest.

Petitioners have given no sound reasons for the change from a small business corporation to a partnership in operating the concessions. The only reason mentioned was that they received legal advice that it would be to their benefit taxwise.

The petitioners were already entitled to receive all the earnings of the concessions when operated by the corporation as a small business corporation. Such earnings were not taxable to the corporation and it added nothing to change to a partnership.

Petitioners contend that pursuant to section 331[3] of the Internal Revenue Code of 1954 the assets transferred to the stockholders upon dissolution of the corporation are to be valued at fair market value. This fair market value, the petitioners say, became the cost basis to the partnership for amortization of the franchise over its remaining life.

The right of a taxpayer to deductions for amortization of an intangible asset is similar to the right to deductions for depreciation. In *Detroit Edison Co.*, 45 B.T.A. 358 (1941), affd. 131 F. 2d 619 (C.A. 6, 1942), affd. 319 U.S. 98 (1943), the Board explained (p. 361):

It is fundamental that the depreciation deduction is allowed upon a capital investment. Where a taxpayer has no capital investment in property it is not entitled to a depreciation allowance in respect of the capital asset. The essential requirements of a capital investment are the laying out of money or money's worth and the acquisition of something of permanent use or value in the business. * * * The mere ownership of property which cost the owner nothing does not give rise to the right of a depreciation allowance.

In the present case the license cost the petitioners nothing. Their corporation paid $3,000 in April 1961 and $3,875 in October 1961 in connection with the original license, and paid $5,000 in April 1962 for additional space, but these were advance rentals which were recoverable out of receipts and did not represent cost. The license cost the corporation nothing. There was no capital investment to be recovered through amortization deductions.

Petitioners were attempting, by dissolving their corporation and transferring the assets received in liquidation to their partnership, to convert the license, which cost the corporation nothing and was not amortizable by it, into an asset subject to amortization notwithstanding the partnership had paid nothing for it.

---

[3] SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS.
(a) GENERAL RULE.—
(1) COMPLETE LIQUIDATIONS.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.

The allowance of amortization to the partnership for the supposed value of the license which had cost nothing to the corporation or its stockholders, the partners, would negate the basic concept of amortization, which is to permit a taxpayer to recover tax free his cost or investment in the property. See *Columbus & Greenville Railway Co.*, 42 T.C. 834, 847 (1964), affd. 358 F. 2d 294 (C.A. 5, 1964), certiorari denied 385 U.S. 827 (1966). The petitioners have no cost basis to recover.

Even if the license were considered amortizable to the partnership, the petitioners have not proved that it had a basis to the partnership of $120,000 or any other substantial amount.

The valuation of $120,000 was placed on the license by Fred J. Kolash, who was president of the corporation and was designated as liquidating trustee. Kolash testified that the valuation was based upon the income of some $50,000 taken in prior to July, the expectation that attendance in the following months would be larger, and the hope that the fair would operate another season. The petitioners' argument is that this was a reasonable estimate of the income expected to be realized in the remaining 113 days of the fair and is corroborated by the actual realized operating income of nearly $110,000 in that period.

Petitioners introduced testimony of Richard Komen, an individual in the food-service business, who currently operates several food-service concessions. He operated a concession at the fair selling hamburgers. He purchased rights at the fair from a prior operator for $3,500 and made an agreement with Century 21 to operate the food stand for the 3 months of the fair then remaining. He hoped the fair would be operated the following year. He expressed the opinion that the value of the petitioners' franchise for the period July 1 to October 21, 1962, based upon the earnings of $25,000 for the month of May and the belief of participants that there would be a second year of the fair, would be in excess of $100,000. This amount is considerably less than the petitioners' valuation. Moreover, while the record does not show the size of the space Komen acquired for $3,500, as compared with petitioners' space, the price he paid is in sharp contrast with his evaluation of petitioners' space and tends to show that the latter is grossly exaggerated.

The valuations of Komen and of Kolash were both based in part upon the expectancy of a second season. A second season was not permissible, however, as Century 21 was required by its contracts to limit the fair to 6 months and this fact was known to all personnel

connected with the fair. Furthermore, the license expired by its terms on October 21, 1962, and included no rights to premises for a later participation had a second fair been held. In such a case new contracts would have to be negotiated and petitioners would have no carryover rights. The hope of another season is not an element of value to the license.

Market value is the price that a willing buyer and willing seller, neither being under compulsion to act, would agree upon. No willing buyer, had he been clairvoyant, would have paid $120,000 for petitioners' license as of July 1, 1962, which, after all his efforts and risks, would produce only $110,000 in earnings and leave him with a loss. Fair market value is not equivalent to total estimated earnings.

The corporation's income tax return for the fiscal year ended April 30, 1962, filed July 16, 1962, does not list the license or franchise as an asset on the balance sheet as of April 30. It claims deductions for amortization of organization expense and depreciation on fixtures, equipment, and leasehold improvements, but not for amortization of franchise. The petitioners' valuation of the license first appears in the small business corporation return filed in October 1962 after the earnings of the concessions were ascertainable with reasonable accuracy. At this time it was known that a second season was not possible. As respondent points out, this is an attempt to convert ordinary income into long-term capital gain. It is not warranted. The license had no such value on July 1, 1962, as contended for by petitioners.

The fact is that there was no market value to the license on July 1, 1962. It was not salable. Even though it might be assumed that Century 21 would permit the petitioners as stockholders of the corporation, to form a partnership and continue operation of the concessions as such, the petitioners could not sell or transfer the license to an outside party. There was an absolute prohibition against transfer.[4] It has been held that an absolute restriction against sale precludes the ascertainment of a market value. *Helvering* v. *Tex-Penn Oil Co.*, 300 U.S. 481, 499 (1937); *Schuh Trading Co.* v. *Commissioner*, 95 F. 2d 404 (C.A. 7, 1938). The license was not marketable and therefore had no market value.

We hold that the license was not subject to amortization.

*Decisions will be entered for the respondent.*

---

[4] The license provided: "Licensee shall not have the right to assign the whole or any part of the Premises, nor to assign, transfer or encumber in any manner this License nor any right, privilege or interest conferred hereby, in whole or in part, to any person, firm or corporation whomsoever."